IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
FEBRUARY 17, 2009 Session

# ROSE JOHNSEY, Widow of Frederick Johnsey v. NORTHBROOKE MANOR, INC., ET AL.

Direct Appeal from the Circuit Court for Madison County
No. C-04-336     Don Allen, Judge

No. W2008-01118-COA-R3-CV - Filed May 14, 2009

The plaintiff filed suit against a nursing home after her husband allegedly suffered a broken hip while he was a resident there. The nursing home filed a motion for summary judgment, asserting that the plaintiff could not prove the elements of her claim. The trial court concluded that the plaintiff's claims were for medical malpractice rather than ordinary negligence, but the court found that under either theory summary judgment was appropriate. We agree with the court's conclusion that the plaintiff's claims sound in medical malpractice, but we find that the trial court erred in granting summary judgment. Therefore, we reverse and remand this case for further proceedings.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

T. J. Emison, Jr., Alamo, TN, for Appellant

Howard B. Hayden, Memphis, TN, for Appellees

OPINION

## I. FACTS & PROCEDURAL HISTORY

Fred Johnsey suffered from Parkinson's Disease and dementia, which affected his ability to walk and communicate with others. Mr. Johnsey also had a history of problems with his right knee. According to his wife, Rose, Mr. Johnsey could stand at his walker if she assisted him. In July of 2003, when Mr. Johnsey was eighty-five years old, he stopped eating and was admitted to a hospital for approximately two weeks due to dehydration and a urinary tract infection. During his hospital stay, Mr. Johnsey's doctors inserted a permanent, percutaneous endoscopic gastrostomy tube, or feeding tube, into his abdominal wall. Mr. Johnsey was agitated, confused, and frightened, and he was given an antipsychotic drug called Seroquel to calm him, which he continued to take after leaving the hospital. On July 28, 2003, Mr. Johnsey was transferred from the hospital to Northbrooke Health Care Center ("Northbrooke") for rehabilitation and physical therapy. Mr. Johnsey was discharged from Northbrooke on August 27, 2003.

On September 5, 2003, Mr. Johnsey was diagnosed with a fractured right hip. On August 5, 2004, Mr. and Mrs. Johnsey filed suit against Northbrooke and its managing entity,[1] alleging that Northbrooke negligently cared for Mr. Johnsey and caused or allowed him to fall and suffer a broken hip. Specifically, the plaintiffs alleged that Northbrooke's negligent acts and omissions included: dropping Mr. Johnsey; failing to provide the necessary support to prevent Mr. Johnsey from falling; failing to provide adequate staff; failing to provide adequate training for its staff; failing to report the injury to Mr. Johnsey's family; failing to report the injury to Mr. Johnsey's doctor; and failing to make a timely referral for medical diagnosis and care. Mr. Johnsey died on January 15, 2005, and Mrs. Johnsey filed an amended complaint as Mr. Johnsey's widow, containing the same allegations of negligence. Northbrooke's answer denied any negligence.

Mrs. Johnsey was deposed, and the discovery deposition of Dr. Kelly Pucek, who diagnosed Mr. Johnsey's hip fracture, was taken as well. Mrs. Johnsey stated during her deposition that the basis of her claim against Northbrooke was her belief that Mr. Johnsey fell on August 8, 2003, during a confrontation with a person who was bathing him at Northbrooke.[2] Mrs. Johnsey acknowledged, however, that she did not actually know what happened because she was not at the nursing home when the incident occurred. She said that when she arrived at the nursing home that day, Mr. Johnsey was already back in his room. When asked how she knew that Mr. Johnsey had fallen, Mrs. Johnsey explained that Mr. Johnsey was "all upset and frazzled" after his bath, he had a cut on his thumb, he was complaining about his right knee hurting, and he wanted aspirin. Mrs. Johnsey said no one ever told her what happened during Mr. Johnsey's bath, but she was not aware of Mr. Johnsey suffering any other falls or incidents at Northbrooke. Mrs. Johnsey stated that Northbrooke's employees either "[l]et him fall or something happened."

---

[1] The relationship of the various defendant entities is not relevant to the issues on appeal. Thus, we will refer to the entities collectively as Defendants or Northbrooke.

[2] Mrs. Johnsey said that somewhere around that date, she and other family members had requested that Mr. Johnsey no longer be given Seroquel because he was "drowsy all the time."

According to Mrs. Johnsey, Mr. Johnsey continued to complain of knee pain during the week after the incident, and either she or her daughter, Priscilla Hornby, ultimately requested that Northbrooke obtain an x-ray of Mr. Johnsey's leg. An x-ray was performed on or about August 20, and the family was told that Mr. Johnsey had a dislocated right knee cap. The doctor who treated Mr. Johnsey in the hospital was notified, but he entered no new orders. On August 22, Mr. Johnsey was taken to see Dr. Kelly Pucek, an orthopedic surgeon.

Dr. Pucek stated during his discovery deposition that he was unable to obtain a history from Mr. Johnsey, himself, due to Mr. Johnsey's apparent dementia and inability to communicate. However, Mr. Johnsey's family members told Dr. Pucek that he had fallen at a nursing home. Dr. Pucek performed a physical examination and range of motion exercises centered around Mr. Johnsey's right knee, which failed to reveal findings consistent with a dislocated patella. Dr. Pucek found no swelling or bruising, and no instability in the patella. He ordered additional x-rays of the knee, which revealed an osteochondral lesion, which he described as arthritic changes to the knee where cartilage and bone had been injured. Dr. Pucek gave Mr. Johnsey an injection in his knee and a brace and scheduled a follow-up visit for two weeks later.

When Mr. Johnsey returned to see Dr. Pucek on September 5, 2003, Dr. Pucek noted that Mr. Johnsey's leg was externally rotated, and he ordered additional x-rays. Dr. Pucek then discovered that Mr. Johnsey had a fractured right hip, which he estimated to be at least four to six weeks old.[3] Dr. Pucek stated during his deposition that he was unable to tell from the fracture itself whether it was the result of a trauma, such as a fall, as opposed to a twisting injury, such as rolling over in bed wrong. Dr. Pucek further stated that he was unable to offer any opinion, to a reasonable degree of medical certainty, as to the cause of Mr. Johnsey's hip fracture.

On February 16, 2006, Northbrooke filed a motion for summary judgment asserting that Mrs. Johnsey had failed to produce either medical or lay testimony as to the cause of Mr. Johnsey's fractured hip, and Northbrooke further argued that she would be unable to establish causation at trial. In support of its motion for summary judgment, Northbrooke filed the deposition of Mrs. Johnsey and the discovery deposition of Dr. Pucek.

On June 9, 2006, the plaintiff filed a response to Northbrooke's motion for summary judgment, claiming that it was "absolutely clear and undisputed" that Mr. Johnsey's hip was fractured on August 8, while he was being bathed. The plaintiff filed numerous documents in opposition to the motion for summary judgment. The plaintiff filed Mr. Johnsey's medical records from Northbrooke, which included a notation from the afternoon of August 8, 2003, which stated, "Res[ident] very agitated this shift. Fought [with] CNA during am care. Obtained [skin tear] during am care to [left] thumb. . . . Wife notified. Dr. Dunnebacke notified. Also notified MD of agitated behavior. New order for Seroquel . . . ."

---

[3] Mr. Johnsey's bathing incident occurred four weeks prior to the date of Dr. Pucek's diagnosis. Six weeks before the date of diagnosis, Mr. Johnsey was still in the hospital.

The plaintiff also submitted an affidavit signed by Dr. Pucek which stated, in relevant part,

> The cause of the right hip fracture was trauma. . . .
> If Mr. Johnsey was free of leg pain before August 8, 2003, and returned from his morning bath with a fresh cut on his left thumb and complaining of pain in his right leg, and continued to complain of pain in his right leg, hold his right leg in one position, and developed an angulation in the right leg, it is my opinion that more likely than not the hip fracture occurred during the morning bath.
> A fracture of the right hip can manifest itself as pain in the right knee.

The plaintiff also submitted the affidavit of Dr. Robert Dunnebacke, who specialized in internal medicine and treated Mr. Johnsey during his hospital stay prior to his admission to Northbrooke. Dr. Dunnebacke stated that Mr. Johnsey did not have any injury to his right hip or leg when he was discharged from the hospital. Dr. Dunnebacke also stated that he agreed with Dr. Pucek's opinion that Mr. Johnsey's hip fracture was four to six weeks old when it was discovered on September 5, 2003. He further stated,

> If Mr. Johnsey was returned to his room from his morning bath August 8, 2003, with a fresh cut on his left thumb and complaining of right knee and leg pain, and thereafter could not move his right leg, continued to complain of pain and the right leg became angulated, then it is my opinion that more likely than not, the right hip fracture occurred during Mr. Johnsey's morning bath August 8, 2003.

Dr. Dunnebacke stated that Mr. Johnsey was suffering from dementia and Parkinson's Disease, and that if he became combative during his bath, "then reasonable care for this elderly gentleman wi[th] diminished mental capacity would have required termination of the attempt to bathe him and returning him to his room."

The plaintiff also submitted the affidavit of Ms. Donna Franklin, who was Mr. Johnsey's "paid sitter." Ms. Franklin stated that she sat with Mr. Johnsey for twelve hours on the day before the bathing incident, and he did not complain of hip, knee, or leg pain. However, Mr. Johnsey was unable to walk by himself and required assistance from Northbrooke aides when moving from his bed to a wheelchair. Ms. Franklin also said that Mr. Johnsey could not turn himself in bed, and Northbrooke aides would turn him regularly. Ms. Franklin stated that when she returned on the day after the bathing incident, Mr. Johnsey was complaining of right knee pain.

The plaintiff submitted an affidavit of Ms. Priscilla Hornby, who was Mr. Johnsey's daughter, and Ms. Hornby's deposition was subsequently filed as well. Ms. Hornby stated that she visited her father nearly every weekend while he was staying at Northbrooke. She said that Mr. Johnsey was agitated, nervous, scared and confused while at Northbrooke, and he would sometimes push the nurses' hands away, grab their hands, or otherwise behave uncooperatively and defensively. She also explained that Mr. Johnsey had difficulty communicating. Ms. Hornby stated that she and other family members had requested that Mr. Johnsey's antipsychotic medication, Seroquel, be

-4-

discontinued because he was always "snowed" or groggy, and she recalled the Seroquel being discontinued near the date of the August 8 bathing incident. Regarding that incident, Ms. Hornby said that when she arrived at Northbrooke that morning, Mr. Johnsey was not in his room. Ms. Hornby said she looked down the hall and saw Mr. Johnsey being escorted down the hall in his wheelchair from the shower or bathroom "in a state of disarray." She said two to three nurses or nurses aides were with Mr. Johnsey, and Mr. Johnsey looked "shellshocked, like he'd just been through a battle or something." Ms. Hornby said she also observed a nickel-sized skin tear on Mr. Johnsey's thumb. According to Ms. Hornby, when the nurses aides were "just about to move him to the bed, he started holding onto his leg above his knee and hollering, 'Oh, oh, oh, oh,' and then they put him in bed and he continued with that, just writhing and rocking back and forth." At that point, according to Ms. Hornby, one of the Northbrooke employees said that Mr. Johnsey "got combative in the bath." Ms. Hornby asked Mr. Johnsey, "Is it your knee?" and he responded "yes," but he did not tell her what had happened. Ms. Hornby said she did not ask any more questions about the incident because she "kind of pictured what he would do before, where he grabs your hands," and she also "just figured it was that same old knee thing again."

Ms. Hornby said she had already planned a meeting with Northbrooke's Director of Nursing for that afternoon to discuss the Seroquel and Mr. Johnsey's physical therapy, and she mentioned during that meeting that Mr. Johnsey had hurt his knee during a fight in the bath, to which the Director of Nursing responded, "I heard about that." Ms. Hornby said she was told that an x-ray would be performed if Mr. Johnsey continued to experience pain. Ms. Hornby stated that Mr. Johnsey was still experiencing pain when she visited him the following weekend, and she noticed that Mr. Johnsey could not uncross his legs, and that his right leg was rotated. The following Monday, approximately ten days after the incident, Ms. Hornby called the Director of Nursing and requested that the x-ray be performed.

At some point in the proceedings, Northbrooke withdrew its motion for summary judgment in order to engage in further discovery, and the evidentiary depositions of Dr. Dunnebacke and Dr. Pucek were taken. Dr. Dunnebacke testified that Mr. Johnsey's hip fracture "could have occurred" during his bath on August 8. However, he later conceded that he had no idea how the hip was fractured, and he stated that, given Mr. Johnsey's condition, he could have been injured notwithstanding the best of care. During Dr. Pucek's evidentiary deposition, counsel for the plaintiff questioned him as follows:

> Q.     I want you to assume that Mr. Johnsey had been free of right leg pain before August the 8th of 2003 and that he had not suffered any trauma to that right leg before then, and that he returned from his morning bath at Northbrooke with a fresh cut on his left thumb and complaining of pain in his right knee area; that he continued to complain of right knee and right leg pain; that he held his right leg in one position and developed an angulation in that leg; and that after August the 8th of 2003 there was no trauma to that leg, do you have an opinion more likely than not when that hip fracture occurred?

A.	Assuming those facts, you would have to come to the conclusion that the injury happened at that time on that date.

However, on cross-examination, Dr. Pucek acknowledged that Mr. Johnsey could have been injured without there being any negligence on the part of the caregivers, and he stated that he sees the type of injury suffered by Mr. Johnsey quite frequently in people of his age. Dr. Pucek said that although he diagnosed the hip fracture, that did not mean he was critical of the nursing home.

On October 18, 2006, Northbrooke filed a renewed motion for summary judgment, contending that the plaintiff had failed to establish causation and a breach of the standard of care, and further arguing that the plaintiff had no legally sufficient proof of the elements of her claim pursuant to the Tennessee Medical Malpractice Act, Tenn. Code Ann. § 29-26-115.

The plaintiff filed a response to the renewed motion for summary judgment, maintaining that it was "crystal clear" that Mr. Johnsey's hip was fractured "while in the care of Northbrooke personnel on the morning of August 8, 2003." The plaintiff filed an expert affidavit from a registered nurse, Cindy Price, who was licensed and practicing in Kentucky, stating that Northbrooke's nursing staff was negligent in caring for Mr. Johnsey on and after August 8, 2003, and that "Mr. Johnsey's hip fracture occurred during his morning bath on August 8, 2003."

The plaintiff also filed the deposition of Ms. Ebony Taylor, the certified nursing assistant who bathed Mr. Johnsey on the morning of August 8. Ms. Taylor testified that she had been trained regarding the proper way to transport and safely handle patients, including the use of gait belts and hoyer lifts in transporting patients. Ms. Taylor said she received such training in order to become a certified nursing assistant, and she had also attended in-services at various nursing homes regarding such techniques. According to Ms. Taylor, Northbrooke required that patients be transported using a gait belt if the certified nursing assistant determined that they were unable to stand "on their own." Ms. Taylor also testified that two people would be needed to transport a patient if the patient had difficulty standing on one leg or if the patient became combative. Ms. Taylor said she was also trained by therapists regarding the proper method of transporting and bathing patients, but that much of it was just common sense.

Ms. Taylor testified that she remembered Mr. Johnsey being combative at times to the point where she would have to get help with him. She said Mr. Johnsey would "just swing at you sometimes or . . . move your hand out of the way or just, you know, hit at your hand." Ms. Taylor did not recall Mr. Johnsey ever walking, but she said he was sometimes able to pivot around from his wheelchair to the toilet. Ms. Taylor said she gave Mr. Johnsey a sponge bath on occasion in the bathroom in his room, but she said she never bathed him anywhere else in the building, such as the shower room down the hall. The bathroom in Mr. Johnsey's room did not have a tub. Ms. Taylor explained that she would take Mr. Johnsey in the bathroom by wheelchair, remove his shirt, and bathe the top part of his body while he was sitting down either in the wheelchair or on the toilet. Ms. Taylor said she would then stand Mr. Johnsey to quickly wash his bottom and then sit him back down because she knew that he could not stand for very long. Although she did not recall the date, Ms. Taylor remembered that during one of these sponge baths, she had to call for assistance because

Mr. Johnsey became combative. She said, "I really don't remember much besides that day when I was trying to give him his bath he was being combative, so I had to go find me some help with him. . . . I don't remember if . . . I left out of the bathroom or what. . . . I don't remember if I pulled the emergency call light in the bathroom or if I had stuck my head out the door to tell somebody to come help." Ms. Taylor also could not remember if she used a gait belt when transporting Mr. Johnsey that day. Ms. Taylor was asked if Mr. Johnsey suffered any cuts, bruises, or abrasions during this incident, and she said that he only suffered a skin tear on his hand. Ms. Taylor said, "I don't remember if he was trying to – if he was holding on to the towel or what it was, but I remember seeing his hand bleeding . . . ." Ms. Taylor did not recall Mr. Johnsey ever experiencing any hip or leg problems. She said she did not know how or when Mr. Johnsey's hip might have been injured and that she never saw Mr. Johnsey fall, slip, miss his seat, or even "sit down hard."

In addition, the plaintiff filed a supplemental response to the renewed motion for summary judgment, asserting that her claims against Northbrooke were for ordinary negligence rather than for medical malpractice.[4] The plaintiff characterized her first cause of action as one "for causing the hip fracture August 8, 2003," and she described the remainder of her claims, regarding the alleged failures to report the injury, as being "for the deformity and shortening of the leg . . . caused by failure to get medical treatment within 48 hours after the fracture occurred."

The plaintiff subsequently filed an expert affidavit from Suzanne Morris, a registered nurse who had practiced in Jackson, Tennessee, since 2005, who stated that Northbrooke and its staff were negligent in caring for Mr. Johnsey and that Mr. Johnsey's broken hip "most likely occurred during the morning bath August 8, 2003, as a result of Northbrooke's negligence in transporting, supporting, and bathing him." Nurse Morris also stated that transporting, bathing, and showering patients are not acts of medical treatment, and she stated that it would be unlawful for a certified nursing assistant to undertake any action constituting medical treatment.

Following a hearing, the trial court allowed the plaintiff another opportunity to depose Dr. Pucek, over Northbrooke's objection. At the deposition, Plaintiff's counsel again asked Dr. Pucek to assume various facts before stating his opinion regarding when and how Mr. Johnsey's hip was broken. The list of assumptions offered by Plaintiff's counsel covers three full pages of the deposition transcript, which we will not reproduce here. Plaintiff's counsel then asked Dr. Pucek his opinion, based on those assumptions, regarding whether Mr. Johnsey's hip was fractured during his bath on August 8, and Dr. Pucek stated that it "could have occurred at that time interval you are talking about." On cross-examination, Dr. Pucek stated that he did not have an opinion within a reasonable degree of medical certainty regarding what actually caused Mr. Johnsey's hip fracture. Dr. Pucek stated, "I just diagnosed the hip fracture. I don't know exactly when that happened or how

[4] The plaintiff conceded that her allegations that Northbrooke negligently failed to report Mr. Johnsey's injury to his doctor and failed to timely refer Mr. Johnsey for medical diagnosis and care would be subject to the medical malpractice statute, but she claimed that the medical malpractice statute should not apply to her claims because it was not pled by Northbrooke as an affirmative defense. The parties do not address this argument on appeal.

it happened, no." Dr. Pucek testified that the hip fracture could have occurred in the absence of caregiver negligence, and that it could have been caused by Mr. Johnsey himself.

Following a hearing, the trial court entered an order on May 14, 2008, granting summary judgment to Northbrooke. The trial court concluded that the plaintiff's claims were for medical malpractice, and that she had failed to offer any competent proof of the elements of her claim. However, the court also found that even if the plaintiff's claims were considered as claims for ordinary negligence, "the plaintiff can not prove causation." Mrs. Johnsey timely filed a notice of appeal.

## II. ISSUES PRESENTED

Mrs. Johnsey recites the following issues in her brief:

1. Was the Trial Court's entry of summary judgment for Defendants error?
2. Did the Trial Court err by ruling that all Plaintiff's causes of action were ones for medical malpractice?
3. Was there material evidence of record of Defendants' negligence?
4. Was there material evidence of record that Defendants' negligence caused injury to Frederick Johnsey, Plaintiff's deceased husband[?]

For the following reasons, we reverse the decision of the circuit court and remand for further proceedings.

## III. STANDARD OF REVIEW

A motion for summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." **Tenn. R. Civ. P. 56.04.** The party seeking summary judgment has the burden of persuading the court that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 83 (Tenn. 2008). "The moving party may make the required showing and therefore shift the burden of production to the nonmoving party by either: (1) affirmatively negating an essential element of the nonmoving party's claim; or (2) showing that the nonmoving party cannot prove an essential element of the claim at trial." *Id.* (citing *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 5 (Tenn. 2008)). The moving party must do more than simply assert that the nonmoving party has no evidence or insufficient evidence. *Id.* at 83-84. Presenting evidence that raises doubts about the nonmoving party's ability to prove his or her claim is also insufficient. *Id.* at 84 (citing *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998)). "The moving party must either produce evidence or refer to evidence previously submitted by the nonmoving party that negates an essential element of the nonmoving party's claim or shows that the nonmoving party cannot prove an essential element of the claim at trial." *Id.* (citing *Hannan*, 270 S.W.3d at 5). "If the moving party is unable to make the required

showing, then its motion for summary judgment will fail." *Id.* (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)).  In other words, "[i]f the moving party does not satisfy its initial burden of production, the court should dismiss the motion for summary judgment." *Hannan*, 270 S.W.3d at 5.  However, "[i]f the moving party makes a properly supported motion, then the nonmoving party is required to produce evidence of specific facts establishing that genuine issues of material fact exist." *Martin*, 271 S.W.3d at 84 (citing *McCarley*, 960 S.W.2d at 588; *Byrd*, 847 S.W.2d at 215).

The resolution of a motion for summary judgment is a matter of law, which we review de novo with no presumption of correctness.  *Martin*, 271 S.W.3d at 84.  However, "we are required to review the evidence in the light most favorable to the nonmoving party and to draw all reasonable inferences favoring the nonmoving party." *Id.* (citing *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000)).

## IV.  DISCUSSION

### A.  *Northbrooke's Motion for Summary Judgment*

In Northbrooke's initial summary judgment motion, it asserted that the plaintiff could not establish the essential elements of her claims because, while the case had been pending for nearly two years, she had not yet produced any lay testimony or expert testimony as to the cause of Mr. Johnsey's fractured hip.  Northbrooke pointed to Dr. Pucek's discovery deposition testimony that he was unable to offer an opinion as to the cause of Mr. Johnsey's hip fracture.  In its renewed motion for summary judgment, Northbrooke pointed to the testimony of Mr. Johnsey's family members regarding their suspicions as to the cause of the hip fracture, and it also cited the deposition testimony of Dr. Dunnebacke and Dr. Pucek, who basically stated that the fracture "could have occurred" during the bath.  Northbrooke maintained that the plaintiff's evidence was insufficient as a matter of law to establish causation.  The trial court granted the motion for summary judgment upon finding that the plaintiff had failed to establish the essential elements of her claim.  We conclude that this was error.

As stated above, a party moving for summary judgment may shift the burden of production to the nonmoving party by either: "(1) affirmatively negating an essential element of the nonmoving party's claim; or (2) showing that the nonmoving party cannot prove an essential element of the claim at trial." *Martin*, 271 S.W.3d at 83.  However, it is not enough to assert that the nonmoving party has no evidence or insufficient evidence, or to point to evidence that raises doubts about the nonmoving party's ability to prove his or her claim. *Id.* at 83-84.  In *Hannan*, 270 S.W.3d at 6, which was released after the trial court entered its final order in this case, our Supreme Court explained that it "did not adopt a 'put up or shut up' approach to burden-shifting in *Byrd* or in subsequent cases."  In other words, in Tennessee, it is not enough to demonstrate "that the nonmoving party's *evidence* – at the summary judgment stage – is *insufficient* to establish an essential element." *Id.* at 7.  Moreover, "[i]t is not enough for the moving party to challenge the nonmoving party to 'put up or shut up' or even to cast doubt on a party's ability to prove an element

at trial." *Id.* at 8. Rather, the moving party has the more difficult task of demonstrating "that the nonmoving party *cannot establish* an essential element of the claim at trial." *Id.* at 7.

> Summary judgment may be appropriate for the moving party who relies upon evidence from the nonmoving party, but only if that evidence affirmatively negates an essential element of the nonmoving party's claim or shows that the nonmoving party cannot prove an essential element of the claim at trial. The moving party may not, however, merely point to omissions in the nonmoving party's proof and allege that the nonmoving party cannot prove the element at trial.

*Id.* at 10.

The case of ***McCarley v. W. Quality Food Serv.***, 960 S.W.2d 585 (Tenn. 1998), is particularly instructive. In ***McCarley***, the plaintiffs alleged that Mr. McCarley contracted food poisoning after consuming chicken at Kentucky Fried Chicken. *Id.* at 587. The defendant moved for summary judgment, claiming that the plaintiffs could not prove causation because Mr. McCarley had eaten bacon earlier that day, either food could have caused the illness, and neither food was tested for bacteria. *Id.* Although the plaintiff's doctor was unable to pinpoint the cause of the food poisoning, he stated that chicken was at the top of the list. *Id.* The defendant claimed that the plaintiffs would be unable to carry their burden of proof at trial. *Id.* The trial court granted summary judgment, but on appeal, the Supreme Court reversed. The Court explained that although the defendant's assertions may have "caused doubt" as to what caused the illness, they did not negate the chicken from the list of possible causes. *Id.* at 588. Therefore, a genuine issue of material fact remained as to causation, and the defendant failed to shift the burden of production to the nonmoving party. *Id.*

In the case before us, we similarly find that although Northbrooke's assertions may have caused doubt as to whether the plaintiff could offer proof at trial to establish the cause of Mr. Johnsey's hip fracture, they did not demonstrate that the plaintiff could not prove her claim at trial. Northbrooke could not force the plaintiff to "put up or shut up" with assertions regarding the sufficiency of the plaintiff's evidence at the summary judgment stage. Because Northbrooke failed to affirmatively negate an essential element of the nonmoving party's claim or show that the nonmoving party could not prove an essential element of the claim at trial,[5] its summary judgment motion should have been dismissed.

### B. Ordinary Negligence or Medical Malpractice

---

[5] We note that Northbrooke did not offer evidence affirmatively negating an essential element of the plaintiff's claim. Northbrooke submitted no evidence, from a medical expert or otherwise, affirmatively establishing that Mr. Johnsey's hip was *not* fractured due to the negligence of Northbrooke employees. Although Ms. Taylor testified by deposition that she never saw Mr. Johnsey fall or slip, she also stated that she could not remember whether she left the room to get help.

With regard to the plaintiff's ability to prove her claim at trial, we are not aware of any scheduling orders entered by the trial court that would have limited the plaintiff's ability to identify additional witnesses.

Next, we find it necessary to address the parties' arguments regarding whether the plaintiff's claims are for ordinary negligence or medical malpractice. The trial court held that the claims were for medical malpractice, but that under either theory, summary judgment was proper. We will address the issue in order to determine the type of proof necessary on remand.

"'[T]he distinction between medical malpractice and negligence is a subtle one, for medical malpractice is but a species of negligence and no rigid analytical line separates the two.'" **Gunter v. Lab. Corp. of Am.**, 121 S.W.3d 636, 639 (Tenn. 2003) (quoting *Weiner v. Lenox Hill Hosp.*, 88 N.Y.2d 784, 650 N.Y.S.2d 629, 673 N.E.2d 914, 916 (1996)). A common law negligence claim requires proof of the following elements: a duty of care, breach of that duty, an injury or loss, cause in fact, and proximate or legal cause. **Id.** (citing *White v. Lawrence*, 975 S.W.2d 525, 529 (Tenn. 1998)). Medical malpractice claims are specifically controlled by the medical malpractice statute, which places on the claimant the burden of proving:

> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
> (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

**Tenn. Code Ann. § 29-26-115(a).**

"Cases involving health or medical entities do not automatically fall within the medical malpractice statute." **Draper v. Westerfield**, 181 S.W.3d 283, 290 (Tenn. 2005). On the other hand, however, "the medical malpractice statute may extend to acts of non-physicians, such as nurses, when they are involved in the medical treatment of a patient." **Gunter**, 121 S.W.3d at 640. The analysis for distinguishing between an ordinary negligence claim and a medical malpractice claim was set forth by the Supreme Court in **Gunter** as follows:

> [W]hen a claim alleges negligent conduct which constitutes or bears a substantial relationship to the rendition of medical treatment by a medical professional, the medical malpractice statute is applicable. Conversely, when the conduct alleged is not substantially related to the rendition of medical treatment by a medical professional, the medical malpractice statute does not apply.

**Id.** at 641. Stated differently, when the gravamen of the complaint is not negligence in furnishing medical treatment to a patient, but the defendant's failure in fulfilling a different duty, the claim sounds in ordinary negligence. **Id.** at 640-41 (citing *Weiner*, 673 N.E.2d at 916).

In *Gunter* and *Draper*, the allegations of negligence arose out of conduct that clearly did not bear a substantial relationship to the rendition of medical treatment. In *Gunter*, 121 S.W.3d at 641, the claim involved the performance of a paternity test, but no rendering of medical treatment was involved. In *Draper*, 181 S.W.3d at 291, the defendant-physician simply reviewed medical records in the context of a child abuse investigation. Thus, the plaintiffs' claims were for ordinary common law negligence. Many other cases, however, have presented a closer question.

In distinguishing between medical malpractice and ordinary negligence claims, courts have also looked to "whether the decision, act, or omission complained of required the assessment of a patient's medical condition and whether the decision, act, or omission required a decision based upon medical science, specialized training or skill." *Conley v. Life Care Ctrs. of Am., Inc.*, 236 S.W.3d 713, 729 (Tenn. Ct. App. 2007) (citing *Holt ex rel. Waller v. City of Memphis*, No. W2000-00913-COA-R3-CV, 2001 WL 846081, at *6 (Tenn. Ct. App. July 20, 2001)). "Acts or omissions complained of in a medical malpractice action should involve matters of the medical arts and/or sciences that require specialized skills not ordinarily possessed by a lay person." *Id.* (citing *Peete v. Shelby County Health Care Corp.*, 938 S.W.2d 693, 696 (Tenn. Ct. App. 1996)). "To the extent the act or omission complained of could be assessed by the trier of fact based on common everyday experiences, it would not fall within the scope of the [medical malpractice act]." *Id.* In sum, "[w]here causes of action involve complaints about acts or omissions involving medical science and expertise, they fall within the scope of the [medical malpractice act]; where they do not involve such training and knowledge, they generally sound in ordinary negligence." *Id.* (citing *Peete*, 938 S.W.2d at 693). For example, in *Peete*, 938 S.W.2d at 694, the plaintiff was recovering from surgery in a hospital room when a hospital technician attempted to remove an orthopedic suspension bar, which was not in use, from her bed. A piece of the bar fell and struck the plaintiff in the head. *Id.* The Court held that the plaintiff's claim was for ordinary negligence because the act did not involve a matter of medical science or art not ordinarily possessed by lay persons. *Id.* at 696.

On appeal, the parties cite numerous other cases applying these principles, which they contend support their respective positions. We will discuss some of these cases to the extent we find them relevant to the issue before us. As these cases demonstrate, "the characterization of a claim as being for ordinary negligence or for medical malpractice 'is a fact-sensitive inquiry, and the distinction is not always clear.'" *Estate of French v. Stratford House*, No. E2008-00539-COA-R3-CV, 2009 WL 211898, at *7 (Tenn. Ct. App. Jan. 29, 2009) (quoting *Estate of Hardin v. Broadmore Senior Servs., LLC*, 2007 WL 2112670, at *7 (M.D. Tenn. 2007)). "The distinction between the two is subtle, and can be problematic in any given case against a health care provider." *Howard v. Kindred Nursing Ctrs., L.P.*, No. W2005-02360-COA-R3-CV, 2006 WL 2136466, at *5 (Tenn. Ct. App. Aug. 2, 2006).

In *Graniger v. Methodist Hospital Healthcare Systems, Inc.*, No. 02A01-9309-CV-00201, 1994 WL 496781, at *1 (Tenn. Ct. App. Sept. 9, 1994) *perm. app. denied* (Tenn. Jan. 3, 1995), the plaintiff went to the emergency room complaining that her legs were swollen and painful. Following an examination by a physician, the plaintiff was left alone in a room to get dressed. *Id.* When she attempted to get down from the examination table, she fell and broke her wrist. *Id.* The plaintiff

-12-

filed suit, alleging that various doctors, nurses, aides and technicians were negligent in allowing her to attempt to get down from the examination table, unassisted, in her impaired condition.  *Id.*  The plaintiff argued that her claims were for ordinary negligence, not medical malpractice.  *Id.* at *3.  On appeal, this Court disagreed and explained that the distinction between the two types of cases depends upon "whether the acts or omissions complained of involve a matter of medical science or art requiring specialized skills not ordinarily possessed by lay persons or whether the conduct complained of can instead be assessed on the basis of common everyday experience of the trier of fact."  *Id.*  We stated, "The duty that plaintiff seeks to impose on defendants in labeling her claim as negligence is based on her medical condition."  *Id.*  Therefore, expert medical testimony was necessary as to whether the plaintiff's condition necessitated assistance.  *Id.*

In ***Harvey v. Wolfer***, No. 03A01-9512-CV-00452, 1996 WL 94819, at *1 (Tenn. Ct. App. E.S. Mar. 6, 1996) *perm. app. denied* (Tenn. July 1, 1996), the plaintiff was sitting on an examination table following an injection when she became nauseous and experienced numbness in her legs.  She began to fall forward, and the defendant and another person "sat her on the floor."  *Id.*  The plaintiff testified that the defendant "either let go or dropped me," which resulted in the plaintiff suffering a fractured ankle when her foot twisted underneath her.  *Id.*  On appeal, the Court held that the plaintiff's claim sounded in ordinary negligence rather than medical malpractice.  *Id.*  The Court distinguished the ***Graniger*** case because, in ***Graniger***, expert medical testimony was necessary as to whether the plaintiff's condition required assistance.  *Id.*  In ***Harvey***, however, the defendant admitted that the plaintiff needed assistance and was actively assisting her when she simply dropped her.  *Id.* at *2.  Therefore, the Court concluded that the plaintiff's allegation that she was dropped did not implicate medical science and could be assessed based on common everyday experience.  *Id.*

In ***McBee v. HCA Health Services of Tennessee, Inc.***, No. M2000-00271-COA-R3-CV, 2000 WL 1533000, at *1 (Tenn. Ct. App. Oct. 18, 2000), the plaintiff underwent a hysterectomy and fell and fractured her ankle two days later when a nurse attempted to ambulate her.  The plaintiff filed suit, alleging that the nurse negligently permitted her to ambulate without adequate assistance and support.  *Id.*  The plaintiff argued that her claims were based upon simple negligence, but the Court of Appeals disagreed, stating, "The assessment of a surgical patient's post-operative ability to ambulate and the choice of the method of ambulation involves specialized skill and training that is not ordinarily possessed by lay persons."  *Id.* at *3.  Similar reasoning was employed in ***Cooksey v. HCA Health Services of Tennessee, Inc.***, No. M2001-00303-COA-R3-CV, 2001 WL 1328539, at *1 (Tenn. Ct. App. Oct. 30, 2001), where the plaintiff alleged that she injured her shoulder following back surgery when two nurses attempted to move her in bed.  The Court of Appeals concluded that the plaintiff's claim was for medical malpractice because "[t]he proper way to move or turn a patient who has undergone a serious back operation is not within the ken of ordinary laypersons."  *Id.* at *2.  In ***Age v. HCA Health Services of Tennessee, Inc.***, No. M2001-01286-COA-R3-CV, 2002 WL 1255531, at *2 (Tenn. Ct. App. Jun. 7, 2002), the plaintiff underwent surgery on her heart and allegedly fractured her arm the following day when nurses lifted the plaintiff's bed sheets and "log-rolled" her onto a CT table.  The Court held that the plaintiff's claim involved medical malpractice rather than ordinary negligence because "[s]pecialized training and

knowledge is required in transporting or moving post-surgical patients and in preparing them for medical procedures." *Id.* at *3.

In ***Howard v. Kindred Nursing Centers, L.P.***, No. W2005-02360-COA-R3-CV, 2006 WL 2136466, at *2, n.2 (Tenn. Ct. App. Aug. 2, 2006), the plaintiffs alleged negligence against a hospital for, among other things: failure to provide accurate and complete nursing assessments and develop and implement an individual nursing plan for the Decedent; failure to prevent the Decedent from becoming dehydrated; failure to prevent the Decedent from developing pressure ulcers; failure to treat those ulcers; failure to supervise the nursing staff assigned to care for the Decedent; failure to evaluate the Decedent's response to nursing care; and failure to record and report to physicians the signs and symptoms of changes in the Decedent's physical condition. The plaintiffs claimed that their cause of action was for ordinary common law negligence, and in support of that position, filed the affidavit of a physician who stated that "turning and repositioning [of patients] is routinely done by nursing assistants who are unlicensed health care professionals," and that "the duties and responsibilities of a nursing assistant . . . do not require a trained individual and that the negligence of these individuals was so obvious that it comes within the knowledge of a lay person." *Id.* at *3. Nevertheless, this Court concluded that the plaintiff's allegations sounded in medical malpractice, stating:

> Reviewing the allegations in the Plaintiffs' second amended complaint, it is apparent that the gravamen of the complaint sounded in medical malpractice; the complaint was based upon allegations of professional negligence by nurses in failing to adequately care for the Decedent while she was receiving medical treatment at Baptist Hospital. The Plaintiffs' allegations of negligent conduct bear a substantial relationship to the rendition of medical treatment by a medical professional, and are therefore subject to Tennessee's Medical Malpractice Act. . . . Consequently, despite the Plaintiffs' attempt to characterize the issue of how often to reposition the Decedent in order to avoid break down of the skin as negligent conduct "so obvious that it comes within the knowledge of a lay person," we must conclude that the trial court did not err in ruling that Tennessee's Medical Malpractice Act governed the instant litigation.

*Id.* at *5 (citations and quotation omitted).

The parties also rely upon a few cases involving care rendered in nursing homes. In ***Franklin v. Collins Chapel Connectional Hospital***, 696 S.W.2d 16, 20 (Tenn. Ct. App. 1985), the plaintiff alleged that a nursing home employee scalded the decedent with hot bath water. This Court held that the plaintiff's allegation that the decedent was scalded during a simple bath gave rise to an ordinary negligence claim, not one for medical malpractice. *Id.*

The plaintiff sued a nursing home in ***Cannon v. McKendree Village, Inc.***, No. M2008-00456-COA-R3-CV, 2008 WL 5048250, at *1 (Tenn. Ct. App. Nov. 25, 2008) (perm. app. filed Jan. 26, 2009), alleging that the nursing home breached a duty to prevent the plaintiff's mother from

falling. The plaintiff's mother was eighty-eight years old, suffering from Alzheimer's Disease and dementia, and she had fallen from her bed at the nursing home on a previous occasion. *Id.* After that first fall, the nursing home's medical director ordered that the patient's bed be set at the lowest mattress level and pushed against the wall, and that a half side railing be raised on the bed to prevent falls. *Id.* However, the plaintiff alleged that the nursing home should have more thoroughly restrained the patient in bed. *Id.* at *3. The Court of Appeals held that the plaintiff's allegations were for medical malpractice, as they involved "a matter of medical science or art requiring skills not ordinarily possessed by lay persons." *Id.* at *5. The Court found it "apparent that such a decision requires specialized knowledge regarding the mental capacity and proclivities of such a patient in order to apply the complicated risk/benefit analysis required, in light of the fact that physically or chemically restraining a patient in bed also exposes him or her to medical risk."[6] *Id.*

In *Estate of French v. Stratford House*, No. E2008-00539-COA-R3-CV, 2009 WL 211898, at *1 (Tenn. Ct. App. Jan. 29, 2009) (perm. app. filed Mar. 30, 2009), a patient entered a nursing home after suffering two strokes, and she also suffered from dementia, diabetes, and arterial fibrillation, for which she had a pacemaker. She was a "total care patient," which included, among other things, "feeding, bathing, linen changes and basic grooming," and the majority of the hands-on care was provided by certified nursing assistants. *Id.* The plaintiff sued the nursing home alleging the following as ordinary negligence: failure to turn the patient every two hours and reposition her to prevent bed sores; failure to properly treat the bed sores once they developed; failure to assist the patient in eating; failure to provide water and to encourage her to drink; failure to bathe her; failure to clean her after incontinence; and failure to adequately staff the nursing home. *Id.* at *8. The Court of Appeals held that the plaintiff's claims were for medical malpractice:

> The Administratrix's allegation of conduct she claims is ordinary negligence such as evaluation of how a particular patient needs to be fed or hydrated, whether the patient is at risk for pressure sores, how often an at-risk patient needs to be turned, how to treat pressure ulcers if they develop, how many caregivers are needed to minister to a particular group of patients and similar allegations, are decisions relating to the care of the Deceased that necessarily involve medical knowledge. These decisions "bear . . . a substantial relationship to the rendition of medical treatment by a medical professional" and are therefore subject to Tennessee's Medical Malpractice Act.

*Id.*

In the case at bar, the plaintiff alleged that Northbrooke was negligent in: dropping Mr. Johnsey or failing to provide the necessary support to prevent Mr. Johnsey from falling; failing to provide adequate staff to support Mr. Johnsey; failing to provide adequate training for its staff to know how to support Mr. Johnsey and prevent him from falling; failing to report the hip injury to Mr. Johnsey's family; failing to report the hip injury to Mr. Johnsey's doctor; and failing to make

_____

[6] The Court found support for its conclusion in testimony from several of the nursing home's witnesses, who stated that only a medical doctor had the authority to order a patient or resident to be chemically or physically restrained. *Cannon*, 2008 WL 5048250, at *5.

a timely referral for medical diagnosis and care. We conclude that these claims sound in medical malpractice, as the decisions, acts, or omissions complained of "required the assessment of a patient's medical condition" and were "based upon medical science, specialized training or skill." *Conley*, 236 S.W.3d at 729. For instance, the plaintiff claims that, due to Mr. Johnsey's condition, he should have been transported using a gait belt or with the aid of an additional nursing assistant, and the plaintiff points to Ms. Taylor's testimony that she could not remember whether she used a gait belt on Mr. Johnsey. We are of the opinion that such a decision required skills or knowledge not ordinarily possessed by a lay person. As in *Graniger*, 1994 WL 496781, at *3, "[t]he duty that plaintiff seeks to impose on defendants in labeling her claim as negligence is based on [a] medical condition." We cannot say that the proper method of transporting and bathing a patient suffering from Parkinson's Disease and dementia, who, consequently, requires antipsychotic medication, may become combative, and has difficulty standing, can be assessed "based on common everyday experiences." *Conley*, 236 S.W.3d at 729. Likewise, the plaintiff's remaining claims, for alleged failures to discover and report the hip injury in order to obtain prompt medical treatment, required the assessment of Mr. Johnsey's medical condition. In sum, the plaintiff's allegations involve decisions relating to the care of Mr. Johnsey that necessarily required medical knowledge. We reject the plaintiff's argument that because some of her claims against the nursing home involved actions taken by a certified nursing assistant, the claims were automatically for ordinary negligence. The medical malpractice statute also extends to acts of non-physicians, such as nurses, when they are involved in the medical treatment of a patient. *Gunter*, 121 S.W.3d at 640; *see also* *Estate of French*, 2009 WL 211898, at *1 (finding all of the plaintiff's claims were for medical malpractice, although the majority of the hands-on care complained of was provided by certified nursing assistants); *Howard*, 2006 WL 2136466, at *3 (finding that claims for failure to turn and reposition a patient were for medical malpractice, even though performed by nursing assistants); *Graniger*, 1994 WL 496781, at *1 (finding that allegations against the "doctors, nurses, aides and technicians" involved in the patient's care constituted claims for medical malpractice). We find that the decisions at issue here were substantially related to the rendition of medical treatment and are subject to the medical malpractice statute. *Gunter*, 121 S.W.3d at 640.

## V. CONCLUSION

For the aforementioned reasons, we reverse the decision of the circuit court and remand for further proceedings. Costs of this appeal are taxed to the appellees, Northbrooke Manor, Inc., Northbrooke Health Care Center, and Tennessee Health Management, Inc., for which execution may issue if necessary.

---
ALAN E. HIGHERS, P.J., W.S.